UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RICHARD A. TURNER,           )
                                     )
         Plaintiff,         )
                                     )
     v.                 )      No.  4:08CV107 CAS
                                     )               (TIA)
MICHAEL J. ASTRUE,         )
COMMISSIONER OF SOCIAL SECURITY,   )
                                     )
         Defendant.      )

## REPORT AND RECOMMENDATION

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act and for Supplemental Security Income under Title XVI of the Act.  The case was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b).

## I.  Procedural History

On December 30, 2004, Plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act, claiming disability beginning December 3, 2004 due to arthritis in the knees, ankles, and hands; emphysema; collapsed lung; and heart condition.  (Tr. 56, 79-81) Plaintiff's applications were denied, after which he filed a request for a hearing.  (Tr. 32-39, 53-55) On April 10, 2006, Plaintiff testified at a hearing before an Administrative Law Judge (ALJ).  (Tr. 197-211) On June 12, 2006, the ALJ entered a decision, finding that Plaintiff was not under a disability as defined by the Social Security Act at any time through the date of the decision.  (Tr. 15-23) The Appeals Council denied Plaintiff's request for review on December 7, 2007, rendering the ALJ's decision the final decision of the Commissioner.

(Tr. 3-5) Plaintiff then filed a Complaint in federal court on January 22, 2008.

## II.  Evidence Before the ALJ

On April 10, 2006, Plaintiff appeared with counsel at a hearing before an ALJ.  At the time of the hearing, Plaintiff was 51 years old and lived by himself.  He had a high school education. Plaintiff testified that he weighed 138 pounds and measured 5 feet 7 inches.  He stated that he recently lost a few pounds because the pain decreased his appetite.  Plaintiff's prior job was as a factory worker in a car plant.  He stopped working in December 2004 because his lung collapsed twice during the fall of that year.  (Tr. 198-200)

Plaintiff testified that he was diagnosed with emphysema, however, he did not use oxygen. He did not have a doctor to treat him for lung problems because he did not have money or insurance. Plaintiff stated that he applied for Medicaid but was not approved.  Plaintiff last saw a doctor in January or February of 2005 at the request of the Social Security Administration.  The last time Plaintiff saw his own doctor was in 2004.  Plaintiff testified that his doctor examined him for complaints of swelling and arthritis in his leg.  Plaintiff also stated that he underwent open heart surgery in 1999 and that his heart still causes problems.  Plaintiff had not taken any medication for about 3 years.  (Tr. 200-202)

Plaintiff testified that he did not drive because he no longer owned a car.  His friend drove him to the hearing.  During the day, Plaintiff tried to keep his house clean.  He sometimes mowed the grass if he felt he could push the lawnmower.  Otherwise, his children mowed the grass.  Plaintiff was able to do his own shopping.  He stated that he loved to hunt and fish but that he last fished over a year ago.  Plaintiff did not hunt for deer or turkey the past two years.  (Tr. 202-204)

Plaintiff stated that he was unable to work due to his inability to stand.  Plaintiff opined that

he could stand for 10 to 30 minutes before he needed to sit down. In addition, Plaintiff stated that his fingers became so stiff from arthritis that he was unable to grasp anything. Plaintiff could sit for 30 to 45 minutes before needing to get up and move around. He stated that he could lift only 10 to 15 pounds. He was able to walk 50 yards between his trailer and his son's trailer, but then he needed to sit down and catch his breath. (Tr. 204-206)

Plaintiff testified that he was a smoker. He no longer smoked a pack or pack and a half per day because he could not afford cigarettes. Plaintiff stated that he continued to smoke maybe a pack once a month. Plaintiff did not know whether his breathing had improved with decreased smoking. He never underwent breathing treatments or took medication for his breathing problems. Plaintiff testified that his arthritis affected him mostly in his elbows, fingers, and the area from his knees to his ankles. Plaintiff described the pain as excruciating. Plaintiff experienced pain daily, which he rated as an 8 or 9 on a scale of one to ten. Because Plaintiff could not afford pain medication, his son gave him Tylenol or Advil, which did not alleviate the pain. (Tr. 206-207)

Plaintiff further testified that he worked several years after his heart surgery. His heart problems did not begin until 2003, when he experienced pain from lifting and work-related stress. Plaintiff felt weak and tired, with decreased endurance. During his employment, Plaintiff made $13.75 per hour, plus overtime. Plaintiff worked in assembly and molding, and he sometimes drove a forklift for material handling. Before Plaintiff quit his job, he worked on the extrusion line, which required pulling and walking. Plaintiff stated that he sometimes felt he was having heart problems but that the feeling could be from the stress of having no money. He only received food stamps, and he was behind on his rent. Plaintiff testified that his collapsed lung and arthritis pushed him over the edge. (Tr. 207-210)

In a Function Report completed by Plaintiff, he stated that his daily activities included eating, straightening his trailer, taking out the trash, watching or listening to the TV or radio, walking to the mailbox, and taking a shower or bath. Plaintiff also stated that he prepared his own meals every day and cleaned the house, washed clothes, and washed dishes at least once a week. Plaintiff also shopped for clothes, food, and personal things once a week. He continued to enjoy hunting and fishing during open season, but spent less time participating in these hobbies because of the pain in his ankles, knees, and hands. Plaintiff reported that his conditions affected his ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, and use his hands. (Tr. 93-100)

### III.  Medical Evidence

The medical evidence shows that Dr. Dilip Banerjee examined Plaintiff on January 16, 2002. Dr. Banerjee noted occasional fluttering in Plaintiff's chest, with normal blood pressure. He diagnosed coronary artery disease and scheduled a stress test. (Tr. 127) A stress echocardiogram, performed on January 21, 2002, was normal. In addition, a myocardial perfusion imaging stress ETT spect imaging with wall motion and ejection fraction performed on January 23, 2002 revealed essentially normal myocardial perfusion imaging with no evidence of stress induced ischemia. (Tr. 130-131)

On June 18, 2002, Plaintiff returned to Dr. Banerjee with complaints of dizziness, leg weakness, headaches, and numbness on the left side of his face. Plaintiff reported that he did not experience chest pain. Dr. Banerjee noted that a chest x-ray demonstrated mild COPD, but the physical examination was otherwise normal. On July 30, 2002, Dr. Banerjee noted Plaintiff's history of tobacco addition, coronary artery disease, and bypass surgery in 1999. Plaintiff complained of weight loss and stress from work. Dr. Banerjee prescribed Wellbutrin and referred Plaintiff to a GI

specialist. Aside from Plaintiff's COPD, the physical exam was normal. Dr. Banerjee also advised Plaintiff to use the nicotine patch. (Tr. 125-126)

Chest x-rays performed on July 31, 2002 revealed emphysema and status post coronary artery bypass graft. However, the physician noted that there had been no interval change in bullous emphysema in the upper lobes since December 1999. (Tr. 129) Blood tests performed on that same date indicated high levels of $CO_2$, LDL Cholesterol, RBC, Hemoglobin, and Hematocrit. In addition, Plaintiffs levels of BUN, AST, HDL Cholesterol, and MPV. (Tr. 133-34) On August 16, 2002, Plaintiff's Hemoglobin and Hematocrit levels continued to be high, and the PH and $O_2$ Saturation of the Arterial Blood Gases were also high. Plaintiff exhibited low levels of Bicarbonate. (Tr. 132)


Plaintiff again visited Dr. Banerjee on October 18, 2002. Dr. Banerjee noted moderate diffusion abnormality. Plaintiff reported that he reduced his smoking to one pack per week, which was much better. Plaintiff attributed his weight loss to his divorce and his bad eating habits. Plaintiff denied any angina, TIA, or claudication. Dr. Banerjee did not find any abnormalities on physical exam but advised Plaintiff to see Dr. Ihorn for erythrocytosis and increase in hemoglobin and hematocrit. (Tr. 124)

Plaintiff has no medical records from October 2002 through April 2004. On April 20, 2004, Dr. Mark Shen examined Plaintiff for complaints of pain in his ankles which radiated to the knees bilaterally. Plaintiff also reported swelling in his ankles and lower legs which increased with standing, along with pain in his hands and wrists bilaterally. Tylenol, Ibuprofen, and Aleve provided no relief. Plaintiff stated that he was laid off work and had been jobless for one year. He planned to begin a new job but did not have health insurance. Physical examination of the extremities revealed hand pain

on palpation at the MCP joints, bilateral pain in the saddle joint of the thumb, and slight edema to the MCP joints of the hands bilaterally with decreased range of motion. Plaintiff exhibited edema to his right and left ankles and trace edema to the right lower extremity with slight erythema. Plaintiff also reported pain with dorceflexion of both ankles and on palpation to medial and lateral aspects of the knee. He complained of increased tightness to his lower extremities when bending his knees. Plaintiff also demonstrated point tenderness over L5-S with radicular pain. Dr. Shen assessed coronary artery disease and recommended medication, compression stockings, and an echocardiogram. Dr. Shen noted that Plaintiff's edema was concerning in light of his prior coronary artery bypass graft surgery. They discussed exercises for Plaintiff's legs while he stood at work. In addition, Dr. Shen assessed possible arthritis. He advised Plaintiff to take Tylenol for pain relief. (Tr. 189-90)

Plaintiff returned to Dr. Shen on June 7, 2004 to follow-up with his echocardiogram, leg swelling, and arthritis. Plaintiff reported smoking a pack of cigarettes per day but denied having any chest pain. Dr. Shen noted trace edema in Plaintiff's ankles bilaterally, which was much improved. Dr. Shen diagnosed coronary artery disease, noting that the echocardiogram showed previous infarct which was stable. He prescribed metoprolol and increased Plaintiff's aspirin intake. Dr. Shen also advised Plaintiff to increase his exercise and strongly warned him to quit smoking. Dr. Shen additionally assessed osteoarthritis, peripheral edema, and tobacco abuse. He recommended that Plaintiff take Ibuprofen for pain and opined that the support hose could control Plaintiff's peripheral edema, even though Plaintiff did not like wearing them. Otherwise, Dr. Shen informed Plaintiff that he may need an ACE inhibitor if further symptoms of heart failure developed. (Tr. 188)

On August 13, 2004, Plaintiff was hospitalized for spontaneous pneumothorax[1]. An x-ray revealed large, right pneumothroax with collapse of the right lung with no significant shift of the mediastinal contents to the left. Dr. James Jansen placed a right thoracic vent in the second intercostal space, mid clavicular line. Plaintiff was discharged the following day. (Tr. 139, 179-86)

Plaintiff followed-up with Dr. Jansen on August 16, 2004. Dr. Jansen noted that Plaintiff was doing quite well with no complaints. A chest x-ray showed a small, residual pneumothorax. Dr. Jansen advised Plaintiff to leave the vent in his chest for 3 more days, after which he would remove the vent if the chest x-ray looked good. On August 19, 2004, Plaintiff's pneumothroax was resolved, and Dr. Jansen removed the vent. One week later, Plaintiff reported feeling much better, and a chest x-ray looked fine. Dr. Jansen dismissed Plaintiff from his care. (Tr. 138-141)

A chest x-ray take on September 28, 2004 revealed significant bullous emphysema, severe interstitial fibrosis, and interstitial lung disease. Plaintiff's lung parenchyma was markedly abnormal, and a small focal liver lesion was most likely a tiny hepatic cyst. The x-ray did not show definite pheumothorax. (Tr. 177-78)

Plaintiff presented to the hospital again on October 14, 2004, complaining of shortness of breath and right-sided chest pain. Plaintiff was diagnosed with pneumothorax and emphysema with continued tobacco abuse. Dr. Norbert Richardson placed a pneumothorax catheter and recommended a consult with a thoracic surgeon for possible bleb stapling. Dr. Thomas Reichers also diagnosed recurring spontaneous pneumothorax with bolus emphysema, which would benefit from bleb stapling

---

[1] Stedman's Medical Dictionary defines "pheumothorax" as "[t]he presence of free air or gas in the pleural cavity." Stedman's Medical Dictionary 1526 (28th ed. 2006). Spontaneous pneumothorax "occurs in people with underlying lung disease, most commonly chronic obstructive pulmonary disease and, less often, interstitial lung disease, pneumonia, lung abscess, and lung tremors." Id.

and tuck pleurodesis. He additionally noted a mass in Plaintiff's right upper lung. Dr. Reichers recommended that Plaintiff see his heart surgeon, Dr. Scott Johnson, to evaluate and treat Plaintiff's bolus emphysema and right upper lobe mass. Plaintiff was discharged the following day. (Tr. 147-48, 166-76)

On October 19, 2004, Dr. Scott Johnson evaluated Plaintiff for recurrent pneumothorax and an abnormal mass. Dr. Johnson noted Plaintiff's history of chronic obstructive pulmonary disease, with bullous emphysema and extensive smoking. Plaintiff continued to smoke 1 to 2 packs of cigarettes per day and had smoked for over 35 years. A review of systems was negative for any significant findings. Physical examination was normal, with clear lungs bilaterally and no edema of the extremities. Dr. Johnson assessed recurrent pneumothoraces, noting that he would generally recommend elective surgery on the right chest. However, Plaintiff's bullous emphysema and possible presence of right lung mass complicated the situation. If the mass was a true right upper lobe lung mass, Dr. Johnson stated that the mass would need to be evaluated for possible malignancy, with PET scan and pulmonary function tests. Dr. Johnson also assessed a history of coronary artery disease, status post coronary artery bypass grafting, currently not symptomatic and chronic obstructive pulmonary disease. He requested all of Plaintiff's prior chest x-rays and recommended that Plaintiff schedule a PET scan, pulmonary function tests, and a follow-up examination to discuss his operative and treatment plan. (Tr. 144-46)

A CT Scan performed on November 15, 2004 revealed some decrease in the abnormal appearance of the right upper lung. However, some areas still remained. The CT also showed new infiltrate in the more inferior portions of the right upper lung, which could be caused by atelectasis or pneumonia. The physician also noted underlying emphysematous lung disease and an unchanged

small area on the liver.  (Tr. 163-64)

Plaintiff saw Dr. David Buvat on February 11, 2005 for a disability benefit determination. Plaintiff complained of arthritis in his knees, ankles, and hands; emphysema; and coronary artery disease.  Plaintiff reported that the chronic problem in his knees, ankles, and hands began 4 years ago. His occupation as a finisher and painter caused discomfort in his knees when walking, and carrying boxes, heavy equipment, and wood materials caused swelling in his hands and warmness in his knees. However, Plaintiff denied any edema or redness of the joints.  Dr. Buvat opined that Plaintiff's condition was related to overuse in his occupation.  Plaintiff reported that he needed to stop and rest his knees after walking 1 to 2 blocks.  However, he did not need to stop due to shortness of breath or chest pain.  Although Plaintiff could bend forward without complication, he could not squat or crawl on the floor.  Dr. Buvat also noted Plaintiff's history of recurrent spontaneous pneumothorax secondary to bullous emphysema.  Despite his history, Plaintiff continued to smoke 5 packs of cigarettes per month.  Plaintiff stated that he had not seen a doctor for the right upper lung mass because of lack of income.  Plaintiff reported no chest pain, shortness of breath, or angina.  He did not use oxygen at home.  Plaintiff also stated that he could not afford medication for his heart condition.  Although he applied for jobs in two places, the employers denied employment because of Plaintiff's chronic medical illness.  (Tr. 150-51)

On physical examination, Dr. Buvat noted that Plaintiff's chest still presented relatively preserved air entry diffusely throughout the lungs with no wheezing.  Examination of the heart revealed prominent S2, with no S3-S4, and possible cardiomegaly.  With regard to Plaintiff's extremities, there was no evidence of tenderness or inflammation in any joint.  His shoulders exhibited normal range of motion, and his neck was normal with no spinous tenderness.  Plaintiff's wrists had

no synovitis or deformity, and the range of motion was actively and passively preserved. Examination of Plaintiff's lower extremities revealed no edema, cyanosis, or clubbing. There was no evidence of crepitus in the knees or significant pain on the joint line bilaterally. Plaintiff's ankles showed no edema or arthritis. His hands were without bony deformity or Heberden's nodes. With regard to function, Plaintiff displayed difficulty squatting; however, he could bend without complication. Plaintiff's gait was stable, and he was able to heel-and-toe walk normally. He was completely free of chest pain. (Tr. 151-52)

Dr. Buvat's impressions were advanced bullous emphysema and recurrent spontaneous pneumothorax; coronary artery disease status post CABG times one; and generalized joint pain secondary to possible joint overuse with no evidence of chronic osteoarthritis on peripheral joints or evidence of radiculopathy. Dr. Buvat stated that Plaintiff had developed advanced emphysema due to his longstanding smoking. He opined that the possibility of recurrent ruptures of further bullae spontaneously was high. However, Plaintiff had no signs of joint limitations which would impair his capacity to perform other activities. Plaintiff's underlying coronary artery disease, along with his inability to afford cardiac medications, increased the risk of an acute coronary event. Dr. Buvat further opined that Plaintiff's sitting was not impaired but that his walking could be limited by advanced emphysema and untreated coronary artery disease. Plaintiff could likely lift 25-30 pounds frequently. Hearing and speaking were normal. Dr. Buvat concluded that temporary financial assistance would help Plaintiff obtain further evaluation of his emphysema and right upper lobe mass. (Tr. 152)

On February 14, 2005, Plaintiff underwent pulmonary function testing, which revealed no clear obstructive or restrictive ventilatory defect. (Tr. 158) A physical residual functional capacity

assessment performed on February 28, 2005 revealed that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently. He could stand and sit for a total of 6 hours in an 8-hour workday. His ability to push and pull was unlimited. Further, Plaintiff could only occasionally climb ladders, ropes, or scaffolds. His emphysema and heart problems created environmental limitations when working in extreme cold and heat; with fumes, odors, dusts, gases, and poor ventilation; and with hazards such as machinery and heights. (Tr. 108-115)

### IV. The ALJ's Determination

In a decision dated June 12, 2006, the ALJ found that Plaintiff met the non-disability requirements for a Period of Disability and Disability Insurance Benefits and was insured through the date of the decision. Plaintiff had not engaged in substantial gainful activity since December 3, 2004. While Plaintiff had a medically determinable combination of impairments that was severe, the impairments did not meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 22)

The ALJ found that Plaintiff's allegations were not totally credible but that Plaintiff's impairments precluded him from occasionally lifting and carrying more than 20 pounds; frequently lifting or carrying more than 10 pounds; walking and standing off and on for more than 6 hours during an 8-hour workday; and sitting for more than 8 hours during a workday. When Plaintiff applied for benefits, he was a younger individual; however, he was closely approaching advanced age on the date of the opinion. Plaintiff had a 12th grade education and likely possessed transferable work skills from his past relevant work. In light of his age, education, and residual functional capacity, however, transferable skills were not a critical issue. The ALJ determined that, based on Plaintiff's age, education, work experience, and residual functional capacity for a full range of

sedentary work, the Medical-Vocational guidelines directed a finding that Plaintiff was not disabled. Thus, the ALJ concluded that Plaintiff was not under a disability, as defined by the Social Security Act, at any time through the date of the decision and was entitled to a Period of Disability, Disability Insurance Benefits, or Supplemental Security Income payments. (Tr. 23)

Specifically, the ALJ assessed Plaintiff's hearing testimony and considered the medical evidence. The ALJ noted that Plaintiff continued to smoke despite repeated advice to stop. With regard to Plaintiff's coronary artery disease, more recent cardiac tests were normal. Medical records also indicated that Plaintiff did not have ongoing or recurring chest pain related to cardiac function. His only reported chest pain pertained to pulmonary function. (Tr. 17)

The ALJ opined that Plaintiff's smoking caused his cardiac damage and led to his lung impairments. The ALJ noted Plaintiff's history of occasional spontaneous pneumothoraxes secondary to a diagnosis of bullous emphysema and the previous placement of a chest tube and thoracic vent. (Tr. 17-18)

In addition, the ALJ observed that the medical records contained no treatment records between October 14, 2004 and the date of the decision. Although Plaintiff saw Dr. Buvat on February 11, 2005, the evaluation was an independent medical examination. The ALJ noted that, during that examination, Plaintiff indicated that he did not experience chest pain or shortness of breath. In addition, he did not require oxygen but did have advanced emphysema due to long-term smoking. (Tr. 18)

With regard to Plaintiff's alleged arthritis, the ALJ found that the medical evidence did not support Plaintiff's allegations. During his hospitalization in October 2004, Plaintiff had good muscle tone in his extremities. In addition, although Plaintiff complained to Dr. Buvat about arthritic pain

12

in his knees, ankles, and hands, Dr. Buvat found no indication of a rheumatic disorder. Instead, Dr. Buvat opined that Plaintiff's impairments could possibly limit his walking but not his ability to sit or lift between 25 and 30 pounds frequently. (Tr. 18)

Based upon the medical evidence, the ALJ determined that Plaintiff had coronary artery disease, mild chronic obstructive pulmonary disease, emphysema, pulmonary fibrosis, and possible arthritis affecting his knees, ankles, and hands. The ALJ further found that the combination of these impairments was severe. However, the impairments did not meet or medically equal the criteria of any listed impairment. (Tr. 18-19)

The ALJ then assessed Plaintiff's credibility in light of his allegations that he was unable to work. The ALJ noted that the objective medical evidence did not support Plaintiff's allegations. For instance, no treating physician ever found or imposed long term, significant, and adverse mental or physical limitations on his functional capacity. Further, recent cardiac tests showed minimal impairment. Despite three previous episodes of pneumothoraxes in 2004, Plaintiff responded well to treatment and had not experienced any subsequent episodes. Plaintiff's breathing was not impaired. In addition, the record contained little objective medical evidence supporting Plaintiff's allegations of arthritis. The ALJ found that the lack of medical evidence supporting Plaintiff's claims was inconsistent with his allegations of disability. The ALJ also found compelling the fact that Plaintiff continued to smoke despite repeated medical advice to stop. The ALJ acknowledged that Plaintiff had decreased the amount he smoked per day but determined that Plaintiff's continued smoking against medical advice was inconsistent with his allegations regarding the seriousness of his cardiac and pulmonary impairments. (Tr. 20)

The ALJ also noted that Plaintiff was no longer taking cardiac medication because of cost and that Plaintiff had not received treatment for any of his impairments since the end of 2004. The ALJ found that the lack of ongoing treatment undermined Plaintiff's credibility regarding the severity of his impairments and his limitations. Although Plaintiff alleged that he could not afford treatment or medication, the ALJ observed that nothing in the record showed that Plaintiff had been refused treatment or medication, nor did the record indicate that he had sought aid to defray medical costs. In addition, the ALJ noted that, despite an alleged inability to afford treatment or medication, Plaintiff continued to purchase cigarettes. (Tr. 20)

The ALJ also relied on Plaintiff's daily activities to conclude that Plaintiff's allegations of disability were not credible. For instance, Plaintiff occasionally mowed the grass and shopped. He also took out the trash, washed laundry and dishes, and cleaned the house. In addition, Plaintiff indicated to Dr. Buvat in 2005 that he was seeking work, which suggested that Plaintiff's impairments would not prevent him from working. (Tr. 20-21)

The ALJ found that Plaintiff's residual functional capacity (RFC) allowed him to perform light work. The ALJ considered Dr. Buvat's assessment and determined that, aside from the statement that Plaintiff's walking could "possibly" be limited by emphysema and coronary artery disease, Dr. Buvat's medical findings supported Plaintiff's ability to perform light work. Because Plaintiff could not return to his past relevant work as an assembler, the ALJ relied on the Medical-Vocational guidelines to find that, in light of Plaintiff's age, education, work experience, and RFC, a significant number of jobs existed in the national economy at the light level which Plaintiff could perform. Thus, the ALJ concluded that Plaintiff was not disabled. (Tr. 21-22)

## V. Legal Standards

14

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that plaintiff is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings

made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[2] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may

---

[2]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

support the opposite conclusion. Marciniak , 49 F.3d at 1354.

## VI.  Discussion

Plaintiff first argues that the ALJ erred in finding that the Plaintiff had the ability to perform other work in the national economy and erred by substituting his opinion for the medical expert's opinion.  Plaintiff also contends that the ALJ erred in finding that the Plaintiff was not a credible witness.  Finally, the Plaintiff asserts that the ALJ erred by failing to obtain vocational expert testimony.  The Defendant responds that the ALJ properly determined Plaintiff's credibility and properly determined that Plaintiff could perform other work in the national economy.  Thus, the Defendant maintains that substantial evidence supports the ALJ's determination.

## A.  Dr. Buvat's Opinion

Plaintiff argues that the ALJ entered his own medical opinion, disregarding the opinion of the consulting physician, Dr. Buvat, to determine that Plaintiff could perform light work.  The Defendant, on the other hand, asserts that the ALJ properly assessed the objective medical evidence and based his opinion on the fact that the evidence failed to support Plaintiff's allegations of debilitating symptoms.

The record demonstrates that the ALJ relied on all of the medical evidence in the record to make his determination.  The undersigned notes that the record is void of any treating physician placing significant restrictions on Plaintiff or finding that Plaintiff was unable to work.  See Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005) (affirming the ALJ's RFC findings because none of plaintiff's treating physicians opined that plaintiff was so impaired or disabled that she could not work at any job).   The ALJ noted Plaintiff's coronary history and Plaintiff's lack of chest pain after his bypass surgery in 1999. Further, the ALJ considered Plaintiff's pneumothorax and found that Plaintiff

had only two episodes prior to his onset date and that these episodes did not appear to limit all activity. In addition, Plaintiff exhibited good muscle tone during his hospitalizations, contrary to his allegations of debilitating arthritis.

Plaintiff contends that the ALJ should have given more weight to the opinion of Dr. Buvat and that the ALJ erroneously substituted his own medical opinion instead. Specifically, the Plaintiff relies on Dr. Buvat's assessment that "[t]he possibility of recurrent ruptures of further bullae spontaneously is high;" that "his underlying coronary artery disease and his inability to afford his cardiac medications will make his risk even higher for an acute coronary event;" and that "[w]alking could be possibly limited because of his advanced emphysema and coronary artery disease that has not been treated." (Tr. 152) Although the Plaintiff argues that the ALJ should have relied on this assessment, the opinion of a physician who examines a plaintiff on only one occasion does not generally constitute substantial evidence. Anderson v. Barnhart, 344 F.3d 809, 812 (8th Cir. 2003); Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000). An ALJ may accord greater weight to a consulting physician only where the one-time medical assessment is supported by better or more thorough evidence or where a treating physician renders inconsistent opinions. Id.

Here, however, Dr. Buvat's opinion is not based on better or more thorough medical evidence and is speculative at best. In fact, Dr. Buvat reported that Plaintiff did not experience chest pain or shortness of breath, nor did the examination indicate any underlying rheumatic disorder. Dr. Buvat based his assessment on Plaintiff's subjective complaints and on prior history and medical tests. (Tr. 150-51) He conducted no additional or more comprehensive testing. In addition, Dr. Buvat opined that Plaintiff's ability to sit was not impaired and that Plaintiff could lift 25-30 pounds frequently, which does not support Plaintiff's allegations of disability. (Tr. 152) Contrary to Plaintiff's assertion,

the ALJ did not substitute his own medical opinion for that of the consulting physician. Instead, the undersigned finds that the ALJ based his decision regarding Plaintiff's ability to work on the medical evidence as a whole, including Dr. Buvat's assessment.

Thus, the ALJ properly concluded that Plaintiff was capable of performing light work in the national economy. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). Nothing in Dr. Buvat's opinion contradicts the ALJ's finding that Plaintiff could perform light work, as Dr. Buvat found only a possibility of walking difficulties due to emphysema and coronary artery disease. However, Dr. Buvat also noted that Plaintiff reported no chest pain or shortness of breath. In addition, pulmonary tests performed after Dr. Buvat's assessment were normal. (Tr. 152, 158) Thus, the ALJ did not substitute his medical opinion for Dr. Buvat's, and substantial evidence supports the ALJ's finding that Plaintiff could perform light work.

## B. Plaintiff's Credibility

Next, Plaintiff claims that the ALJ erred in finding that he was not a credible witness. The undersigned disagrees. The record shows that the ALJ considered all of the evidence and properly discredited Plaintiff's allegations of disability. First, the ALJ noted that the medical evidence did not support Plaintiff's allegations. As previously stated, no treating physician found or imposed long term, significant physical limitations on Plaintiff's functional capacity. This contradicts Plaintiff's allegations that he is unable to work. Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005); see also Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008) (finding fact that doctors had not placed

plaintiff under any restrictions due to his pulmonary status was inconsistent with complaints of persistent and debilitating symptoms). Further, Plaintiff was not receiving ongoing treatment for his alleged impairments. The ALJ may properly discount a plaintiff's allegations where the plaintiff has failed to seek medical treatment. Mouser, 545 F.3d at 638; Osborne v. Barnhart, 316 F.3d 809, 812 (8th Cir. 2003).

Although Plaintiff contends that he did not pursue medical treatment based on lack of finances, Plaintiff has presented no evidence that he attempted to obtain treatment and was denied such treatment based on lack of insurance or an inability to pay. The ALJ may properly discount a plaintiff's argument that he could not afford treatment where the plaintiff presents no evidence that he sought and was denied low-cost or free medical care. Osborne, 316 F.3d at 812. In addition, although Plaintiff claims that he could not afford his medication, the ALJ properly relied upon the fact that Plaintiff did not forgo smoking to help finance his medication. Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999).

Plaintiff argues that the ALJ failed to mention, however, that Plaintiff had cut down on his smoking. Regardless of whether the Plaintiff was attempting to quit, the record demonstrates that Plaintiff continued to smoke in spite of strong medical advice to stop smoking. Plaintiff does not dispute that smoking contributed to his pulmonary and coronary problems, and Dr. Buvat attributed Plaintiff's advanced emphysema to smoking. (Tr. 152) In light of the correlation between Plaintiff's smoking and its impact on his pulmonary impairments, "the ALJ appropriately considered [Plaintiff's] failure to stop smoking in making his credibility determination." Mouser, 545 F.3d at 638 (citation omitted).

In addition, the ALJ properly discredited Plaintiff on the basis of his daily activities. Despite

20

his allegations of disability, Plaintiff reported that he could cook, clean his home, occasionally mow the lawn, walk to the mailbox, take out the trash, do the laundry, shop, hunt, and fish. These activities are inconsistent with Plaintiff's allegations of disabling pain. Gwanthey v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (holding that Plaintiff's ability to perform housework among other activities precluded a finding of disability). Based upon the aforementioned inconsistencies, the undersigned finds that the ALJ properly assessed Plaintiff's credibility and found that Plaintiff's impairments were not as severe as he alleged. Hamilton v. Astrue, 518 F.3d 607, 613 (8th Cir. 2008).

## C.  Vocational Expert Testimony

Plaintiff finally argues that the ALJ erred by failing to obtain vocational expert (VE) testimony and by relying on the Medical-Vocational Guidelines (Grids). However, the undersigned finds that the ALJ properly relied on the Medical Vocational Guidelines to determine that Plaintiff could perform the full range of light work. Vocational expert testimony is required only "when the claimant has nonexertional impairments, which make use of the medical-vocational guidelines, or 'grids,' inappropriate." Banks v. Massanari, 258 F.3d 820, 827 (8th Cir. 2001) (citations omitted). However, "[i]f the ALJ properly determines that a claimant's RFC is not significantly diminished by a nonexertional limitation, then the ALJ may rely exclusively upon the Grids and is not required to hear the testimony from a VE." Dodson v. Astrue, No. 6:07-cv-6049, 2008 WL 2783454, at *5 (W.D. Ark. July 17, 2008). Only where the ALJ explicitly discredits a Plaintiff's subjective complaints of pain for legally sufficient reasons may the ALJ rely on the Grids. Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006) (citations omitted).

As stated above, the ALJ discredited Plaintiff's subjective complaints of disabling pain by

finding inconsistencies in the record under the <u>Polaski</u> standards. Thus, the ALJ properly relied on the grids, and did not need vocational expert testimony to determine that Plaintiff could perform light work in the national economy. <u>Id.</u> at 895.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED.**

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this __10th__ day of February, 2009